**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CIT Finance LLC,<br><br>　　　　Plaintiff/Counter-Defendant,<br><br>v.<br><br>Treon, Aguirre, Newman & Norris PA,<br><br>　　　　Defendant/Counter-Claimant.<br><br>Treon, Aguirre, Newman & Norris PA,<br><br>　　　　Third-Party Plaintiff,<br><br>v.<br><br>Pacific Office Automation Inc., et al.,<br><br>　　　　Third-Party Defendants. | No. CV-14-00800-PHX-JAT<br><br>**ORDER** |

Following the judgment entered by the Court upon stipulation of the parties Plaintiff CIT Finance LLC ("CIT") and Defendant Treon, Aguirre, Newman & Norris PA ("Treon Aguirre"), (Doc. 101), Treon Aguirre's Third-Party Complaint against Pacific Office Automation, Inc. ("POA"), Darin DuMolin, and Derek Abert ("Defendants") remained, (Doc. 48 at 12–17). Now pending before the Court is Third-Party Defendants' Motion for Summary Judgment ("Motion"). (Doc. 102). The Court now rules on the Motion.

## I. FACTUAL BACKGROUND

In early 2013, Treon Aguirre ("Plaintiff"), a Phoenix law firm, and POA, an office equipment supplier, entered into negotiations to lease office equipment, including printers, copiers, and scanners. (Plaintiff's Statement of Supplemental Controverting Facts, Doc. 107 ("PSSCF") at ¶ 1; Third Party Defendants' Statement of Facts in Support of Its Motion for Summary Judgment, Doc. 103 ("DSOF") at ¶¶ 1, 2). As part of these negotiations, POA representatives Darin DuMolin and Derek Abert met multiple times with Plaintiff's employees to determine the firm's equipment needs. (Third-Party Plaintiff's Statement of Controverting Facts, Doc. 107 ("PCSOF") at ¶ 3; DSOF at ¶ 3). During these meetings, Mr. DuMolin and Mr. Abert represented to the employees that the new equipment would "meet or exceed the office's current equipment." (Doc. 107-1 at 6). Additionally, the POA representatives promised that the equipment would perform specific functions, such as "print[ing] envelopes, offset[ing] documents, and hole-punch[ing] documents." (PSSCF at ¶¶ 2, 3; Doc. 107-1 at 6).

In February 2013, POA delivered the equipment to Plaintiff's office and began installation. (PSSCF at ¶ 5). Upon delivery, Plaintiff's employees immediately noticed that the new equipment fell short of their expectations. (*Id.* at ¶ 6; PCSOF at ¶¶ 4, 13; Doc. 107-1 at 6, 7, 24). The equipment could not perform many of the functions that POA representatives had promised, and Plaintiff's employees believed that the equipment did not perform as well as their previous equipment. (PSSCF at ¶ 6; Doc. 107-1 at 6–8, 13, 19, 24). Plaintiff's accountant, Deborah Carter, expressed dissatisfaction to Mr. DuMolin and mentioned returning the majority of the new printers. (Doc. 107-1 at 28–41).

In March 2013, Plaintiff's founding partner, John Aguirre, signed a Modified Lease Agreement (the "Agreement"), (Doc. 103-1 at 2–4), and Equipment Delivery and Acceptance Receipts (the "Acceptance Receipts"), (Doc. 103-4 at 2, 3), acknowledging "the complete and satisfactory delivery and installation of the [e]quipment leased from [POA]." (*Id.*). These documents covered 34 pieces of equipment, including the printers

Ms. Carter had wanted returned. (Docs. 103-1 at 2–4; 103-4 at 2, 3). As part of the Agreement, POA agreed to "buyout" Plaintiff's then-existing equipment leases, (DSOF at ¶ 6; PCSOF at ¶ 6); Plaintiff agreed to make a minimum monthly payment of $3,781, (Doc. 103-1 at 2).

In April 2013, pursuant to the Agreement, POA paid $32,066.36 to GE Capital and $3,970.64 directly to Plaintiff because "it was in collections for nonpayment." (DSOF at ¶ 6; PCSOF at ¶ 6). POA sold its Agreement with Plaintiff to CIT, a third-party finance company but maintained an obligation to provide service and supplies on the equipment. (DSOF at ¶¶ 8, 9; PCSOF at ¶¶ 8, 9). Meanwhile, Plaintiff failed to make any payments under the Agreement. (DSOF at ¶ 12; PCSOF at ¶ 12).

In May 2013, despite frequent maintenance visits by POA over the prior two months, some of the leased equipment continued to exhibit problems. (Docs. 103-3 at 2–12; 107-1 at 45–52). On May 16, Ms. Carter again contacted Mr. DuMolin to return the desktop printers. (Doc. 107-1 at 52). Mr. DuMolin then sought to meet with Mr. Aguirre or Richard Treon, Plaintiff's other founding partner; however, because "communication broke down," the parties never met. (*Id.*; PCSOF at ¶¶ 14, 15). Despite the equipment deficiencies, Plaintiff used much of the equipment, generating over 1.3 million copies on the large format photocopiers, running over 14,678 images on the fax machine, and generating over 45,858 images on the smaller-scale printers. (DSOF at ¶ 19; PCSOF at ¶ 19).

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1). Thus,

summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.*

### A. Rescission of the Agreement

Plaintiff argues that Defendants misrepresented material facts regarding equipment functions during negotiations, and, thus, Plaintiff seeks to rescind the Agreement with

POA. (Doc. 48 at ¶¶ 60–68). Defendants rejoin that Plaintiff is "prohibited from simultaneously maintaining an action to rescind the [l]ease (based [on] alleged fraud) and [an] action for damages" and, alternatively, Plaintiff ratified the Agreement, thereby waiving its rescission argument. (Doc. 102 at 6–7).

The parties do not dispute that Chapter 2A of the Arizona Uniform Commercial Code applies here. However, as the Court held in an earlier summary judgment order for this case, the U.C.C. does not preclude a common-law fraud defense to rescind a contract. (Doc. 42). The Court, in analyzing whether "hell or high water clauses" (express or incorporated by Ariz. Rev. Stat. § 47-2A407 (2005)) bar a finance lessee's common-law fraud defense, explained as follows:

> Arizona courts have not decided the issue, and it appears that other courts do not entirely agree on the answer. *Compare Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005) ("Nothing in the Code explicitly preempts common law actions for fraudulent misrepresentation, and courts have entertained such actions in commercial cases [involving hell or high water clauses]."), *and Colo. Interstate Corp. v. CIT Grp./Equip. Fin., Inc.*, 993 F.2d 743, 749 (10th Cir. 1993) ("In the absence of fraud or deceit which is not claimed here, it is our view that under Texas law the parties should be held to their agreement [containing a hell or high water clause]."), *with C & J Vantage Leasing Co. v. Wolfe*, 778 N.W.2d 66 (Iowa Ct. App. 2009), *vacated C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65 (Iowa 2011) ("The enforceability of this [hell or high water] provision precludes Wolfe's affirmative defenses of fraud in the inducement, estoppel, mutual mistake, and an interest-rate disclosure defense grounded in Iowa Code chapter 535.") (citing *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. 993, 1007 (Bankr. S.D.N.Y. 1982)), *and Colonial Pac. Leasing Corp. v. McNatt*, 486 S.E.2d 804, 805 (1997) ("We conclude that a 'hell or high water' clause does not insulate a lessor's assignee from a claim of fraud where an agency relationship can be established between the assignee and the perpetrators of the alleged fraud.").
>
> Addressing U.C.C. provisions virtually identical to Arizona's, the First Circuit held that "[n]othing in the [Massachusetts] Code explicitly preempts common law actions for fraudulent misrepresentation, and courts have entertained such actions in commercial cases." *Eureka*, 400 F.3d at 68. The court reasoned that several U.C.C. provisions specifically preserve the fraud defense, including a provision in Chapter 2A, which deals with leases. *Id.* (citing Mass. Gen. Laws ch. 106, §§ 1-103, 2A-505(4)). The court also noted that the U.C.C. provision that expressly precludes fraud claims only applies

> when a buyer has bought goods on credit and misrepresented its solvency. *Id.* (citing Mass. Gen. Laws ch. 106, § 2-702).
>
> The Court agrees with the First Circuit that the text of the U.C.C. does not preclude fraud claims by finance lessees who have accepted the goods. As the First Circuit points out, Chapter 2A specifically provides that "[r]ights and remedies for material misrepresentation or fraud include, without limitation, all rights and remedies available under this article for default." A.R.S. § 47-2A505(d). To be sure, the U.C.C. limits some of the rights and remedies of finance lessees who have accepted goods, *see* A.R.S. § 47-2A517 (providing for the right to revoke acceptance of goods "[e]xcept in the case of a finance lease"); A.R.S. § 47-2A407(a) (a finance lessee's "promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods"), but no provision in the U.C.C. precludes fraud claims by finance lessees. Furthermore, the official comment to the U.C.C. notes that a "hell or high water" provision is only enforceable "absent . . . application of the principles of law and equity, including the law with respect to fraud." Uniform Commercial Code § 2A-407 cmt. 5. Thus, as evidenced by its text as legislative history, the U.C.C. does not preclude all defenses by a finance lessee.
>
> Additionally, and more fundamentally, Arizona courts recognize that "when fraud enters into a transaction to the extent of inducing execution of a written document, the instrument never becomes a valid contract, and the party seeking to rescind the contract is not bound by its terms." *Wagner v. Rao*, 885 P.2d 174, 176 (Ariz. Ct. App. 1994) (citing *City Dodge, Inc. v. Gardner,* 208 S.E.2d 794 (Ga. 1974)). Accordingly, "any provision in a contract making it possible for a party thereto to free himself from the consequences of his own fraud in procuring its execution is invalid." *Lutfy v. R. D. Roper & Sons Motor Co.*, 115 P.2d 161, 166 (Ariz. 1941). In other words, a hell or high water clause in a lease that was induced by fraud is invalid because the lease itself is invalid. For the same reason, even though a finance lessees' "promises under the lease contract become irrevocable upon the lessee's acceptance," A.R.S § 47-2A407(a), a lessee who enters into a lease by fraudulent inducement has made no "promises" at all. Precluding a party from asserting fraudulent inducement could have the effect of binding a party to a contract to which the party never validly agreed. The Court therefore concludes that neither express provisions in a finance lease nor the U.C.C. preclude finance lessees from asserting fraud defenses.

(*Id.* at 5–8). Thus, it is logical that because the U.C.C. does not preempt fraudulent inducement claims, it also does not preempt common-law defenses to fraudulent

- 6 -

inducement claims.

The Arizona Supreme Court has recognized that "as a matter of law, a party waives his right to rescind a contract if, with knowledge of the facts entitling him to rescind, he continues to treat the contract as a subsisting obligation and accepts the benefits thereof." *Page Inv. Co. v. Staley*, 468 P.2d 589, 590 (Ariz. 1970) (citing *Mackey v. Philzona Petroleum Co.*, 378 P.2d 906, 908 (Ariz. 1963)). Explaining this principle, the Arizona Supreme Court reasoned that "[w]here the complaining party has access to all the facts surrounding the questioned transaction and merely makes a mistake as to the legal consequences of his act, equity should normally not interfere, especially where the rights of third parties might be prejudiced thereby." *Nussbaumer v. Super. Ct.*, 489 P.2d 843, 846 (Ariz. 1971). Thus, where a party has, by continuing to accept the benefits of a bargain, acknowledged facts that would ordinarily allow rescission, that party's only remaining remedy is to sue for damages under the contract. *See Mackey*, 378 P.2d at 909.

Defendants first argue that Plaintiff "is prohibited from simultaneously maintaining an action to rescind the [l]ease (based [on] alleged fraud) and [an] action for damages." (Doc. 102 at 6). Defendants are incorrect. Although Plaintiff cannot *both* rescind a contract and also affirm the same contract and sue for damages, Plaintiff may pursue inconsistent claims until required to elect a remedy before at the conclusion of trial. *See* Ariz. Rev. Stat. § 47-2A505(E) (2005) ("Neither rescission nor a claim for rescission of the lease contract nor rejection or return of the goods may bar or be deemed inconsistent with a claim for damages or other right or remedy."); *see also Edward Greenband Enters. of Ariz. v. Pepper*, 538 P.2d 389, 392 (Ariz. 1975) ("[W]e are still of the view that a person cannot be forced to elect in advance at his peril upon what theory or remedy he will proceed until the conclusion of the trial.").

Defendants' second argument is that Plaintiff ratified the Agreement, thus waiving its right to rescind, by signing the Acceptance Receipts and continuing to use the equipment despite having knowledge of the equipment's nonconformities. (Docs. 102

at 6–7; 108 at 4–5; 103-4 at 1–3). Plaintiff responds that "multiple emails evidence the rejection of certain equipment as early as February 2013." (Doc. 106 at 6). Most of these e-mails, however, simply indicate that Defendants "ordered too much equipment" and clarify the equipment covered under the Agreement. (Doc. 107-1 at 27, 30; *see also* PCSOF at ¶ 4 ("POA initially sought to deliver forty three pieces of equipment.")). Plaintiff's first purported rejection of desktop printers was by Ms. Carter in February 2013; however, Plaintiff seemingly withdrew this rejection when Mr. Aguirre later signed the Acceptance Receipts and Agreement, both of which included the printers.

Plaintiff's only other attempted rejection occurred in May 2013. (Doc. 107-1 at 49). Despite Plaintiff's three-month delay in rejecting some of the nonconforming equipment, it is undisputed that Plaintiff was aware of the nonconformities upon delivery. (*See* PCSOF at ¶¶ 4 ("Immediately problems were identified with the quality of the printers."), 13 ("Problems with the lease equipment arose immediately upon delivery of the equipment to [Plaintiff]."); Doc. 107-1 at 6 ("[W]hen the office equipment was delivered, it could not and did not perform many of the functions we specifically advised we needed and asked about in our meeting."), 7 ("With respect to my new printer, after it was installed, I immediately realized I could not print envelopes and that it did not even have a tray for envelopes."), 8, 13, 19, 24, 25). However, a few weeks after delivery— and despite Plaintiff's realization of the nonconformities—Mr. Aguirre signed the Agreement and Acceptance Receipts, indicating "the complete and satisfactory delivery and installation" of the equipment. (DSOF at ¶ 4; PCSOF at ¶ 4; Docs. 103-1 at 2–4; 103-4 at 2–3). Given Mr. Aguirre's significant experience in the legal field, Plaintiff does not claim he misunderstood the language of the documents that he signed. Further, Plaintiff does not dispute that it has extensively used much of the equipment over the last few years. (DSOF at ¶ 19; PCSOF at ¶ 19). Therefore, having accepted the benefits of the Agreement after discovering the alleged misrepresentations, Plaintiff is bound by the Agreement's terms and may not seek rescission. Accordingly, the Court grants Defendants' Motion as to Plaintiff's fraudulent inducement claim.

### B. Tort Claims

Independent of its fraudulent inducement claim, Plaintiff seeks damages under theories of negligent misrepresentation, statutory consumer fraud, and common-law fraud. (Doc. 48 at ¶¶ 69–88). Defendants argue that the economic loss rule (the "ELR") bars these tort claims.

#### 1. Economic Loss Rule

The ELR precludes common-law tort actions seeking "pecuniary damages not arising from injury to the plaintiff's person or from physical harm to property." *Sullivan v. Pulte Home Corp.*, 306 P.3d 1, 3 (Ariz. 2013) (quotations omitted). The underlying rationale of the ELR recognizes that contract law is better designed to protect a party's expectations while tort law is designed to protect the safety of persons and property. *See Gilbert Unified Sch. Dist. No. 41 v. CrossPointe, LLC*, No. CV 11-00510-PHX-NVW, 2012 WL 1564660, at *4 (D. Ariz. May 2, 2012) (citing *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010)). However, the ELR is "not a *per se* rule denying tort liability to all plaintiffs who suffer only economic losses," *Jes Solar Co. v. Matinee Energy, Inc.*, No. CV 12-626 TUC DCB, 2015 WL 10943562, at *3 (D. Ariz. Nov. 2, 2015); rather, a court must examine each case to determine whether "the facts preponderate in favor of the application of tort law or commercial law exclusively or a combination of the two." *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 198, 210 (Ariz. 1984). Alternatively, with respect to statutory causes of action, the ELR does not prohibit recovery. *See Shaw v. CTVT Motors, Inc.*, 300 P.3d 907, 909–10 (Ariz. Ct. App. 2013) (holding that the ELR does not bar a claim under Arizona's Consumer Fraud Act ("ACFA"), because "[t]he Legislature drafted the [A]CFA broadly, and expressly provided that [A]CFA claims can be brought in addition to seeking other remedies" (quotations and citations omitted)).

Here, Plaintiff seeks recovery of purely economic loss unaccompanied by physical injury to persons or other property. Further, Defendants' alleged misrepresentations are inseparable from the essence of the contractual agreement. Plaintiff alleges that

1  Defendants misrepresented and fraudulently represented the quality and capabilities of
2  the equipment. (Doc. 106 at 10). This allegation is indistinguishable from the allegation
3  underlying Plaintiff's breach of contract claim. (*See id.* at 12). Thus, because Plaintiff's
4  contract claims preponderate, the ELR bars its common-law tort claims. *See Flagstaff*,
5  223 P.3d at 668; *see also Cook v. Orkin Exterminating Co.*, 258 P.3d 149, 153 (Ariz. Ct.
6  App. 2011).

7  Because it is statutory, Plaintiff's ACFA claim is the only tort claim that survives
8  the ELR. Accordingly, the Court grants Defendants' Motion on Plaintiff's negligent
9  misrepresentation and common-law fraud claims.

### 2.     Arizona Consumer Fraud Act Claim

The ACFA broadly prohibits fraudulent, deceptive, or misleading conduct in connection with the sale or advertisement of consumer goods and services. Ariz. Rev. Stat. § 44-1522(A) (2013 & Supp. 2015). Arizona courts construe the ACFA to provide consumers with a claim for relief that is easier to establish than common law fraud. *Dunlap v. Jimmy GMC*, 666 P.2d 83, 89 (Ariz. Ct. App. 1983). To prevail, a plaintiff must establish that: (1) the defendant made a misrepresentation in connection with the sale or advertisement of merchandise, and (2) defendant's conduct proximately caused plaintiff to suffer damages. *Parks v. Macro-Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. Ct. App. 1979).

ACFA claims have a statute of limitations period of one year. *See* Ariz. Rev. Stat. § 12-541(5) (2016); *see also Murry v. W. Am. Mortg. Co.*, 604 P.2d 651, 654 (Ariz. Ct. App. 1979). The limitations period begins to run when the consumer discovers, or with reasonable diligence should have discovered, both the "who" and the "what" of her claim. *Gustafson v. Goodman Mfg. Co.*, No. 3:13-CV-8274-HRH, 2014 WL 1669069, at *5 (D. Ariz. Apr. 28, 2014) (citations omitted). "This occurs when the consumer knows whose products were involved and that the products were not performing as expected." *Id.*

Defendants argue that the statute of limitations on Plaintiff's ACFA claim could

not have begun to run later than May 2014, when Mr. Aguirre wrote to Mr. DuMolin that the POA "machines do not comport with the representations made by [POA] and do not meet the needs of [Plaintiff]."[1] (Doc. 102 at 10). Thus, because Plaintiff did not file their Third-Party Complaint against Defendants until June 12, 2015, (*see* Doc. 48), Defendants argue that the one-year statute of limitations had already run, (Doc. 102 at 10). Plaintiff argues that Defendants are "estopped from asserting [that] the statute of limitation[s] . . . bars [Plaintiff's] consumer fraud claim" because "negotiations continued into June 2014." (Doc. 106 at 9). To support this argument, Plaintiff cites to an e-mail memorandum from Mr. Treon informing Plaintiff's employees that the firm was "in a battle with the vendors" and directing them to "outline the damages that you think we have suffered as a result of getting inferior equipment." (*Id.*; Doc. 107-1 at 53–54).

"There is considerable authority for the proposition that mere conduct of settlement negotiations does not estop the defendant from pleading the statute of limitations." *McBride v. Kieckhefer Assocs., Inc.*, 265 P.3d 1061, 1067 (Ariz. Ct. App. 2011) (citing applicable cases). "[E]quitable estoppel is more likely to be found when the defendant has accepted liability or agreed to pay." *Id.* That is not the case here. There is no suggestion that Defendants did anything to lull Plaintiff into inactivity or wrongfully continue negotiations until the statute of limitations had run. Moreover, Plaintiff cites to no evidence even showing ongoing negotiations with Defendants following the May 2014 e-mail from Mr. Aguirre. Plaintiff knew for over 13 months that Plaintiff believed Defendants fraudulently misrepresented the equipment's functions. Thus, Plaintiff has failed to support its theory supporting equitable estoppel, and the

---

[1] The Court accepts Defendants' concession that the statute of limitations did not begin to run until May 2014 but notes that the statute of limitations may have begun to run as early as February 2013, when Plaintiff states that "[i]t became immediately apparent that the equipment would not perform as represented by [Mr.] DuMolin and [Mr.] Abert." (Doc. 106 at 3).

Furthermore, the Court notes that the parties failed to submit this e-mail to the Court in support of either party's filings at summary judgment. However, to the extent that *both* parties rely on this e-mail, (Docs. 102 at 10; 106 at 9), and no party disputes its authenticity or admissibility, the Court will consider this e-mail at the summary judgment stage.

- 11 -

Court grants Defendants' Motion on Plaintiff's ACFA claim.

### 3. Punitive Damages

Because Plaintiff has no remaining tort claims, the Court grants Defendants' Motion as to punitive damages. *See Rawlings v. Apodaca*, 726 P.2d 565, 577 (Ariz. 1986) (holding that awarding punitive damages requires "evidence reflect[ing] something more than the conduct necessary to establish the tort" (quotations and citations omitted)); *see also Young v. Liberty Mut. Grp., Inc.*, No. CV-12-2302-PHX-JAT, 2013 WL 840618, at *4 (D. Ariz. Mar. 6, 2013) ("Because [the plaintiff] has not adequately alleged a tort against [defendant], her claim for punitive damages against him must be dismissed as well.").

## C. Contract Claims

### 1. Breach of Contract

Plaintiff claims that Defendant POA breached the Agreement by supplying nonconforming equipment and failing to resolve Plaintiff's equipment problems in good faith. (Doc. 106 at 12). Defendant POA argues that it "fully and finally delivered" the agreed-upon office equipment, and it had no further duties under the Agreement after Plaintiff breached the Agreement by its nonpayment. (Doc. 102 at 12–13).

#### a. Plaintiff's Acceptance of the Nonconforming Equipment

The parties disagree whether Plaintiff accepted the equipment. Plaintiff declares that it "never accepted the nonconforming equipment and appropriately rejected the equipment." (PSSCF at ¶ 11). Defendant POA disputes this contention and argues that any purported rejection was inoperative as a matter of law because Mr. Aguirre later signed the Agreement and Acceptance Receipts. (DSOF at ¶¶ 4, 5).

Here, the Agreement itself defines acceptance of the goods as occurring "upon delivery." (Doc. 103-1 at 3). Although Ariz. Rev. Stat. § 47-2A515 ordinarily governs acceptance under a lease agreement, under Ariz. Rev. Stat. § 47-1302(A) (Supp. 2015), parties may vary the effect of U.C.C. provisions by agreement. However, Ariz. Rev. Stat. § 47-1302(B) (Supp. 2015) prevents parties from fixing a "manifestly unreasonable"

time for completing a requirement under the Code. Acceptance at delivery does not provide a reasonable opportunity to inspect the goods as required by Ariz. Rev. Stat. § 47-2A515(A) and would effectively eliminate any remedy under the lease. Under the Agreement, Plaintiff would be required to accept any goods delivered, despite their condition. Thus, the definition of acceptance under Ariz. Rev. Stat. § 47-2A515(A) is unaffected by the Agreement.

>Acceptance under the U.C.C. is defined as follows:
>
>A.   Acceptance of goods occurs after the lessee has had a reasonable opportunity to inspect the goods and:
>   1.   The lessee signifies or acts with respect to the goods in a manner that signifies to the lessor or the supplier that the goods are conforming or that the lessee will take or retain them in spite of the nonconformity; or
>   2.   The lessee fails to make an effective rejection of the goods.

Ariz. Rev. Stat. § 47-2A515(A) (2005). Because the statute provides that "acceptance" is determined by the actions of the lessee—i.e., "[t]he lessee *signifies* or *acts*" and "[t]he lessee *fails*"—the focus is on Plaintiff's conduct in determining whether Plaintiff accepted the leased equipment. *Id.* (emphasis added).

What constitutes a "reasonable opportunity" for inspection depends on the circumstances of a particular case. "A reasonable time to inspect under the [U.C.C.] must allow an opportunity to put the product to its intended use, or for testing to verify its capability to perform as intended." *Colonial Pac. Leasing Corp. v. JWCJR Corp.*, 977 P.2d 541, 545 (Utah Ct. App. 1999). Here, when Mr. Aguirre signed the Agreement, Plaintiff had possessed much of the equipment for over a month, (*see* Doc. 103-2), and had recognized "[p]roblems with the lease equipment . . . immediately upon delivery." (PCSOF at ¶ 13). Extensive testing was not required for many of the alleged nonconformities, such as some printers being "too large for employee work spaces" or the printers' paper trays not holding "as much paper" as the previous printers. (Doc. 107-1 at 19). Additionally, Plaintiff discovered even the more difficult-to-discover nonconformities quickly. (*See, e.g.*, *id.* at 6 ("Within a week's time of my scanner's

installation, it was obvious to me the scanner did not perform as well as my prior scanner.")). Moreover, Plaintiff has presented no argument that it did not have a reasonable opportunity to inspect the equipment. Thus, the Court concludes that Plaintiff had a reasonable opportunity to inspect the equipment. *See Rafter Seven Ranches L.P. v. C.H. Brown Co.*, 546 F.3d 1194, 1201–02 (10th Cir. 2008) (holding that a lessee had a reasonable opportunity to inspect sprinklers under a lease agreement where the lessee "recognized immediately" that the sprinklers were nonconforming).

Plaintiff's actions also meet both prongs of Ariz. Rev. Stat. § 47-2A515(A)(1). First, Mr. Aguirre, a sophisticated lessee, expressly represented to Defendant POA that Plaintiff accepted the equipment by signing both the Agreement and Acceptance Receipts in March 2013. Second, in April 2013, Mr. Aguirre e-mailed Mr. DuMolin to inquire about Defendant POA's buyout obligations under the Agreement to pay GE Capital and Plaintiff. (Doc. 103-10 at 7). Third, although Plaintiff notified Mr. DuMolin of problems with certain equipment, Plaintiff conveyed these problems as remediable—not nonconforming. (*See, e.g.*, Doc. 107-1 at 39 ("Can we get someone out today to fix this issue?"), 45 ("Please send someone out today on these issues because they need to be addressed today.")). By its actions, Plaintiff signified to Defendant POA that the equipment was either conforming or Plaintiff was taking the equipment despite any nonconformity, thus "accepting" the goods within the meaning of Ariz. Rev. Stat. § 47-2A515(A)(1).

Furthermore, Plaintiff's actions constitute acceptance under Ariz. Rev. Stat. § 47-2A515(A)(2) because Plaintiff's belated effort to modify the Agreement did not constitute an "effective rejection." To constitute an "effective rejection," the rejection must occur within a reasonable time. *See, e.g.*, *IMA N. Am., Inc. v. Marlyn Nutraceuticals, Inc.*, No. CV-06-0344-PHX-LOA, 2009 WL 160367, at *17 (D. Ariz. Jan. 22, 2009) (holding that a buyer "did not effectively reject [equipment] because there is no evidence that [the buyer] informed [the seller] of that alleged defect within a reasonable time"). The first time Plaintiff attempted to reject any of the equipment was

Ms. Carter's February 2013 e-mail seeking to return some of the desktop printers. (Doc. 107-1 at 30). However, as previously discussed, Mr. Aguirre undermined this rejection by later signing the Agreement and Acceptance Receipts, which both included the desktop printers. (Docs. 103-1 at 2–4; 103-4 at 2–3). The second purported rejection occurred in Ms. Carter's May 2013 e-mail, in which she wrote that "[w]e want to return all desktop printers" and referenced her February 2013 rejection. (Doc. 107-1 at 49). However, even assuming Ms. Carter had the authority to reject any equipment,[2] Ms. Carter's purported rejection three months after knowing of the nonconformities is untimely and not an "effective rejection." *See, e.g.*, *Rafter Seven Ranches*, 546 F.3d at 1201–02 (holding that a lessee who made no payments under the leases but did nothing to reject defective sprinklers for six weeks did not reasonably reject the goods); *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 552 (Ind. Ct. App. 1987) (holding that a buyer failed to effectively and timely reject equipment where buyer did not give unambiguous rejection until nineteen days after receipt, despite buyer's claimed dissatisfaction with the product from first day of receipt).

Although Plaintiff has provided affidavits and e-mails from its staff evidencing their protestations regarding various nonconformities, Plaintiff has failed to present any evidence that either Mr. Aguirre or Mr. Treon—apparently the only individuals who possessed the authority to modify the lease on Plaintiff's behalf,[3] (Doc. 103-11 at 15)— rejected any of the equipment. Rather, despite objections from Plaintiff's staff regarding

---

[2] In a separate e-mail to Mr. DuMolin, Ms. Carter indicated that only Mr. Aguirre and Mr. Treon had authority to alter the Agreement. (Doc. 103-11 at 15 ("Since we are having such a hard time setting up an appointment to get the contract re[]done and get these desktop printers picked up before someone gets hurt by tripping on them since you can't come get them now, is there any way if given permission by both [Mr. Aguirre] and [Mr. Treon] that you guys can sit down with me instead?")).

[3] Plaintiff does not attempt to explain why Mr. Aguirre would sign documents covering equipment that Plaintiff's staff had vocally disparaged. Additionally, there is evidence that Mr. Aguirre contradicted the requests of Ms. Carter to Mr. DuMolin in other settings. (*See, e.g.*, Doc. 107-1 at 74 ("John told us that the printers will stay put and the users will print envelopes to the HPs.")). Despite these internal contradictions, Plaintiff has provided no affidavit from Mr. Aguirre explaining why (or even disputing whether) his actions contradicted his staff's expressions.

1  the purportedly nonconforming equipment, Mr. Aguirre indicated his acceptance of the
2  nonconforming equipment by signing the Agreement, signing the Acceptance Receipts,
3  inquiring into Defendant POA's payments under the lease, and failing to effectively
4  reject any of the equipment. Thus, under Ariz. Rev. Stat. § 47-2A515(A), Plaintiff
5  "accepted" the equipment as a matter of law. *See, e.g.*, *Pace v. Sagebrush Sales Co.*,
6  560 P.2d 789, 791 (Ariz. 1977) (deciding, as a matter of law, that a buyer accepted goods
7  from a seller because the buyer did an act inconsistent with the seller's ownership under
8  the U.C.C.'s sales provision); *Salt Lake City Corp. v. Kasler Corp.*, 855 F. Supp. 1560,
9  1566 (D. Utah 1994) (holding that a contractor's breach of contract claim against a
10 supplier for providing nonconforming materials was barred where the contractor had a
11 reasonable opportunity to inspect the materials and, thus, accepted the nonconforming
12 materials).

### b. Breach of the Agreement

Given that Plaintiff accepted the nonconforming equipment and does not argue that it revoked its acceptance, Defendant POA contends that its duties under the Agreement were discharged due to Plaintiff's nonpayment under the Agreement. (Doc. 102 at 12–13). Plaintiff provides no legal argument but, rather, restates that it never accepted the equipment. (*See* Doc. 106 at 11–13).

"An uncured material breach of contract relieves the non-breaching party from the duty to perform and can discharge that party from the contract." *Murphy Farrell Dev., LLLP v. Sourant*, 272 P.3d 356, 364 (Ariz. Ct. App. 2012) (citing *Zancanaro v. Cross*, 339 P.2d 746, 750 (Ariz. 1959)). Here, Plaintiff materially breached its obligations under the Agreement by failing to make any payments beginning in April 2013. Thus, Defendant POA was relieved of its duties to provide service under the Agreement following Plaintiff's breach. Accordingly, the Court grants Defendant POA's Motion as to Plaintiff's breach of contract claim.

### 2. Breach of the Covenant of Good Faith and Fair Dealing

Defendant POA argues that Plaintiff "has not specified any acts by POA that

constitute a lack of good faith" and "the evidence shows that POA made multiple efforts to work with [Plaintiff] to fix 'glitches' in its migration to POA's office equipment." (Doc. 102 at 13) (emphasis omitted). In response, Plaintiff cites generally to affidavits from Plaintiff's employees and states that they "dispute the good faith of POA's attempts to resolve the equipment problems." (Doc. 106 at 12).

All Arizona contracts as a matter of law include the implied duties of good faith and fair dealing and contract damages are available for their breach. *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract. *See Beaudry v. Ins. Co. of the W.*, 50 P.3d 836, 841 (Ariz. Ct. App. 2002) (citing *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 29 (Ariz. 2002)). The essence of the implied covenant is "neither party will act to impair the rights of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings*, 726 P.2d at 569.

Here, Plaintiff provides no specific evidence of Defendant POA's bad faith in its performance under the Agreement. At most, the affidavits from Plaintiff's employees reflect "extreme[] dissatisf[action] with the lack of service" and frustration with the delivered equipment. (Doc. 107-1 at 22). Meanwhile, e-mails between Plaintiff and Mr. DuMolin reflect frequent visits to Plaintiff's office to fix various issues with the equipment. (*See, e.g.*, Docs. 103-9 at 2–4; 103-3 at 6; 107-1 at 13). Additionally, when Mr. DuMolin attempted to respond to Plaintiff's dissatisfaction, Plaintiff—not Mr. DuMolin—cancelled planned meetings with just a few hours' notice, (*see* Doc. 103-11 at 7–11), or was simply unresponsive, (*see id.* at 2–4, 7–17). Mere dissatisfaction does not breach the covenant of good faith and fair dealing. Although Plaintiff cites to e-mails in which Mr. DuMolin sought separate meetings with Mr. Aguirre to sign a lease for separate computer equipment, (PCSOF at ¶ 14), it is unclear how these unrelated e-mails would lead to bad faith with the Agreement at issue. Here, Plaintiff has failed to present

1  any evidence showing Defendant POA acted in a way that would breach the covenant of
2  good faith and fair dealing. Accordingly, the Court grants Defendant POA's Motion as to
3  Plaintiff's breach of the covenant of good faith and fair dealing claim.

### III.  CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Third-Party Defendants' Motion for Summary Judgment (Doc. 102) is **GRANTED**. The Clerk of Court shall enter judgment in favor of Third-Party Defendants Pacific Office Automation, Inc., Darin DuMolin, and Derek Abert, and against Third-Party Plaintiff Treon, Aguirre, Newman & Norris PA. Because these are the only remaining parties, the Clerk of the Court shall close this case.

Dated this 8th day of November, 2016.

James A. Teilborg
Senior United States District Judge

- 18 -